# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EDWARD WISNESKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-864 |
| | ) | |
| | ) | |
| OFFICER SHAWN DENNING, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

**CONTI, Chief District Judge**

In this civil rights case Edward Wisneski ("Wisneski") accuses the City of Greensburg ("City") and several of its police officers of violating his constitutional rights during his July 4, 2010 arrest. Specifically, Wisneski brings claims, pursuant to 42 U.S.C. § 1983, alleging that the officers at the scene of his initial traffic stop and eventual arrest violated his Fourth Amendment rights by subjecting him to excessive force. Wisneski seeks compensatory damages against the officers in their official and individual capacities, and punitive damages against them in their individual capacities. (ECF No. 1 ¶¶ 41-48.) Wisneski also contends that the City and certain supervisory officers violated § 1983 due to an alleged custom, policy, or practice of violating citizens' Fourth Amendment rights, and seeks compensatory damages against these defendants. (<u>Id.</u> ¶¶ 49-55.)

As a result of the events occurring on the night of July 4, 2010, a jury empaneled by the Criminal Division of the Court of Common Pleas of Westmoreland County, Pennsylvania, convicted Wisneski of a) driving under the influence, b) escape, c) fleeing or attempting to elude an officer, d) recklessly endangering another person, and e) resisting arrest. On December 16, 2011, Wisneski was sentenced to between 21 and 42 months imprisonment on the most serious of those charges, i.e., escape, to be served concurrently with the lesser sentences imposed for the remaining four criminal convictions. After he was incarcerated and while his direct appeal was pending, Wineski filed the instant civil rights case.

Defendants Officer Shawn Denning ("Denning"), Officer Regina DePelligrin ("DePelligrin"), Officer Jason K. Dieter ("Dieter"), Lieutenant Douglas Marcoz ("Marcoz"), Chief Walter J. Lyons ("Lyons"), Captain George Seranko ("Seranko"), and the City (collectively, "defendants") filed a joint motion for summary judgment. (ECF No. 27.) Defendants filed a brief in support of the motion, (ECF No. 29), a concise statement of material facts, (ECF No. 28), and a reply brief, (ECF No. 39). Wisneski filed a response to defendants' concise statement of facts, (ECF No. 32), and an opposition brief. (ECF No. 34). After the close of briefing, the parties submitted a joint concise statement of material facts. (ECF No. 40.) As requested by the court, defendants subsequently filed a complete copy of the transcript of Wisneski's criminal trial. (ECF No. 41.)

In their motion, defendants argue that Wisneski's § 1983 claims cannot proceed because proof thereof would "call into question the lawfulness of [Wisneski's] conviction or confinement" or "render [Wisneski's] conviction or sentence invalid," in violation of the rule announced in <u>Heck v. Humphrey</u>, 512 U.S. 477, 483, 486-87 (1994). (ECF No. 29 at 2-14.) Defendants argue, alternatively, that judgment must be entered in their favor because the officers

2

are entitled to qualified immunity, and Wisneski failed to produce any evidence to support a reasonable jury finding that Wisneski was subjected to excessive force or that the City or its supervisors had a custom, policy, or practice of violating citizens' Fourth Amendment rights. (Id. at 14-20.)

In opposition, Wisneski contends that defendants' reliance on Heck is "misplaced" because a favorable result in this case is not necessarily inconsistent with his criminal convictions. (ECF No. 34 at 5-9.) According to Wisneski, the jury in the Westmoreland County criminal case failed to resolve several factual disputes that are crucial to determining whether or not the force used against him on the night of his arrest was objectively reasonable. (Id. at 2-3, 9-11.) In response to defendants' alternative arguments, Wisneski contends that the officers are not entitled to qualified immunity, and that there is sufficient evidence to support reasonable jury determinations that he was subjected to excessive force on the night of July 4, 2010, and that the City, and its supervisory officers, failed to train its officers with respect to when to use a stun gun. (Id. at 11-13.)

For the reasons that follow, defendants' motion will be granted. Wisneski's excessive force claims arising out of the initial traffic stop are barred by the Heck rule. Although the Heck rule does not bar Wisneski's claims that he was subjected to excessive force at the scene of his arrest, no reasonable jury could find, based upon this record, even viewed in the light most favorable to Wisneski, that he was the victim of excessive force during his arrest. To the extent Wisneski brings a claim based upon an alleged denial of medical care, Wisneski failed to produce evidence sufficient to overcome entry of judgment as a matter of law on this legal claim. There being no underlying constitutional violation, Wisneski's claims for municipal and supervisory liability fail.

Judgment will be entered in each defendant's favor on all claims and this case will be closed.

## I. <u>FACTUAL BACKGROUND</u>

All material facts set forth herein are undisputed unless otherwise indicated. Additional material facts may be discussed elsewhere in this memorandum opinion, in context.

### A. <u>The July 4, 2010 Incident</u>

At approximately 7:00 p.m. on July 4, 2010, Denning observed a blue Pontiac sedan that was driving ahead of him on West Pittsburgh Street, in the City of Greensburg, Pennsylvania, swerve, cross over into the second lane of travel, and almost hit another car. (ECF No. 40 ¶ 22.) Denning activated his siren and emergency lights in order to initiate a traffic stop to determine if the driver was under the influence of drugs or alcohol. (<u>Id.</u> ¶¶ 23, 25.) After the cars were stopped, Denning approached the Pontiac sedan, asked that the driver shut off the vehicle, which the driver did, and asked the driver to produce his driver's license, which he did, after fumbling with his wallet. (<u>Id.</u> ¶¶ 26-27.) Wisneski blamed his swerving on potholes in the road, but Denning told Wisneski that he was directly behind him and that there were no potholes and that the roadway was recently paved. (<u>Id.</u> ¶ 29.) During this interaction, Denning observed a strong odor of alcohol coming from the car and that Wisneski slurred his speech when answering Denning's questions. (<u>Id.</u> ¶ 27.) Wisneski drank twelve to fifteen beers in a three- to four-hour period prior to being pulled over by Denning. (<u>Id.</u> ¶ 19.)

After obtaining Wisneski's driver's license, Denning recognized Wisneski to be the same man Denning recently arrested for driving under the influence ("DUI") on March 14, 2010. (Id. ¶¶ 8-9, 28.) During the March 2010 traffic stop, Wisneski was arrested after agreeing to take a field sobriety test. (Id. ¶¶ 8-9.) Wisneski pleaded guilty to the DUI charges stemming from his March 14, 2010 arrest. (Id. ¶ 11.)

Denning directed Wisneski to get out of his vehicle and advised him that he was going to conduct some field sobriety tests, to which Wisneski replied "this is going to be a long ride." (Id. ¶ 30.) Denning contends that Wisneski reached toward the ignition of the car, causing Denning to reach into the car with his left hand in an attempt to remove the keys, resulting in a physical scuffle between the men. (Id. ¶¶ 31-32.) According to Denning, during the altercation, he punched Wisneski in the left side of his face in order to free himself from Wisneski's grasp. (Id. ¶ 34.) Wisneski contends that he does not remember reaching for the ignition, grabbing Denning's arm, or having his hands on Denning at all, and asserts that he never attempted to start the car. (Id. ¶¶ 31-34.) According to Wisneski, Denning punched him in the face in an unprovoked attack after Denning realized who Wisneski was from his driver's license, and Wisneski made the comment that "this is going to be a long ride." (Id.)

Around the time that Wisneski handed Denning his driver's license and began to struggle with Denning, DePelligrin arrived at the scene. (Id. ¶ 35.) It is common practice for a second officer to act as backup for a traffic stop, and DePelligrin, who was working the 3:00 p.m. to 11:00 p.m. shift for the City's police department that night, heard Denning's report of the traffic stop over the radio and proceeded to the scene to assist Denning. (Id. ¶¶ 20, 24, 34, 36.) As DePelligrin exited her vehicle, she saw Denning reach into Wisneski's car and get pulled in. (Id. ¶ 37.) DePelligrin realized there was a struggle taking place and ran to assist Denning,

pulling out her stun gun[1] as she ran. (Id.) According to DePelligrin and Denning, Wisneski had

the car running at this time. (Id. ¶ 38.)  Wisneski contends that when DePelligrin arrived, his car

was not running. (Id.)

      There is no dispute that upon arriving at Wisneski's car DePelligrin pressed her

stun gun against Wisneski's upper left arm and activated it for several seconds, while Wisneski

was seated behind the steering wheel of his car. (Id. ¶¶ 38-39, 42.)  DePelligrin deployed her

weapon in drive stun mode, which is when the head of the gun is pressed against someone's skin

or clothing in order to gain compliance by temporarily incapacitating the person with an

electrical shock lasting not more than six seconds. (Id. ¶¶ 39-40.)  The other way to use a stun

gun is to fire the weapon such that wires, with probes at the end, are propelled from the gun and

either hit or are embedded in a subject's skin. (ECF No. 28-10 at 4.)  There is no dispute that the

stun gun was used on Wisnesk only in drive stun mode.  It is also undisputed that after being

stunned, Wisneski slapped at DePelligrin "in self-defense," yelled at her to "get off" him, and

reached for the gear shift at which time DePelligrin stunned Wisneski a second time on his left

side. (ECF No. 40 ¶ 42.)  After this second stun, Wisneski drove away while DePelligrin's arms,

shoulders, and head were still inside the driver's side window of Wisneski's car. (Id. ¶ 43.)

DePelligrin was able to extricate herself from the car as Wisneski drove off. (Id. ¶ 44.)

      After Wisneski drove away, DePelligrin and Denning got into their respective

police cars, activated their emergency lights and sirens, and began to chase Wisneski. (Id. ¶ 45.)

DePelligrin and Denning were later joined in their pursuit of Wisneski by Dieter and Marcoz,

---

[1] The parties refer to this weapon as a "taser" throughout their briefing.  Taser is actually a brand name for a stun gun, and a federally registered trademark owned by Taser International, Inc. U.S. Trademark Registration No. 3,010,500.  The record reflects that DePelligrin's weapon was a Taser brand stun gun, and therefore, in this opinion, the court will refer to the weapon as a Taser or, more generally, as a stun gun.

who were each in separate cars and heard radio transmissions about the incident. (Id. ¶¶ 54-55.) The officers followed Wisneski for a distance of at least two and a half miles at speeds exceeding the posted speed limit, and attempted various maneuvers to stop Wisneski's vehicle before Dieter was able to block the roadway with his car. (Id. ¶¶ 46-53, 57-58, 72.) Wisneski drove into an embankment in front of a house located on Locust Valley Road. (Id. ¶¶ 57-58.)

Officers Denning, DePelligrin, and Dieter exited their vehicles and approached Wisneski's car. (Id. ¶¶ 59-60.) Denning yelled at Wisneski to stop the car and get out. (Id. ¶ 59.) The record is disputed with respect to whether Wisneski placed the car in park immediately after driving into the embankment, or whether one of the officers placed the car in park for him. (Id.) Wisneski claims that after he drove into the embankment, he "placed his forehead on top of the steering wheel in a position of submission." (Id. ¶ 60.) It is undisputed that officers Denning and DePelligrin reached into the car through an open window in order to remove the keys from the ignition and unlock the door. (Id. ¶¶ 60, 62-63.) They could only open the door partially because it was against the embankment. (Id. ¶ 62.) It is undisputed that Wisneski did not exit the car voluntarily, and that Dieter forcibly had to pull Wisneski from the car. (Id. ¶¶ 60, 62-63.) Wisneski does not deny that while being pulled out of the partially-opened car door he slapped, smacked, and grabbed the officers' hands and arms. (Id.) According to Wisneski, a stun gun was again used on him before he was forcibly removed from his car. (Id. ¶ 60.)

As stated, the officers physically had to pull Wisneski out of his car, initially attempting to do so through the driver's side window, while, unbeknownst to the officers, Wisneski was still being secured by his seat belt, and eventually through the partially-opened driver's side door. (Id. ¶ 61-63.) The officers placed Wisneski on the pavement and handcuffed him. (Id. ¶ 64.) Wisneski did not physically resist the officers after he was placed in handcuffs,

and it is undisputed that no force was used on Wisneski after he was placed in handcuffs. (Id. ¶¶ 66-68.)  Wisneski was placed in the back of Denning's police car after he was handcuffed. (Id. ¶ 63.)  Marcoz, who was the other three officers' supervisor and had joined in the pursuit of Wisneski, arrived at the scene after Wisneski was in custody. (Id. ¶¶ 21, 71.)

Wisneski was driven by Denning from Locust Valley Road to the Greensburg police station where he was photographed and fingerprinted by Marcoz. (Id. ¶ 76.)  At the time he was processed, Wisneski was not wearing a shirt and Marcoz did not notice any injuries to Wisneski's torso. (Id. ¶ 77.)  Denning, who completed the incident report, initially indicated that Wisneski suffered no injuries as a result of his arrest, but changed the report immediately after completing it upon realizing that Wisneski had scratches on his legs. (Id. ¶ 75.)  Wisneski contends that he had one discussion while at the police station "about could I seek some medical attention" with an unidentified police officer, which, he asserts, was ignored. (Id. ¶ 74.) Wisneski was released no more than four hours after arriving at the police station to the custody of Brenda Cunningham ("Cunningham"), his girlfriend, and Aaron Mascherma ("Mascherma"), a personal friend. (Id. ¶¶ 80, 116-17.)

Upon being released from police custody, Wisneski went home and did not seek medical treatment until he went to the emergency room at Westmoreland Hospital on July 5, 2010, more than twenty-four hours after his arrest. (Id. ¶¶ 81-82.)  Wisneski insisted that hospital personnel take photographs of his injuries, which photographs show scrapes and bruises on Wisneski's lower leg, right temple, left back, and buttocks. (Id. ¶¶ 83, 118, 121.)  Medical records indicate that emergency room personnel could not obtain a complete accurate history on what happened because Wisneski reported that he was intoxicated at the time of the incident and

could not recall what happened. (Id. ¶ 85.) There is no evidence in the record that Wisneski sought follow-up treatment after visiting the hospital on July 5, 2010. (Id. ¶ 84.)

Several days after the incident, on July 9, 2010, Wisneski went to the Westmoreland County District Attorney's Office to file a complaint against the City's police department with respect to the July 4, 2010 incident. (Id. ¶ 86.) Detective Terry Kuhns ("Kuhns") met with Wisneski and Cunningham, who accompanied him on the day that he walked into the district attorney's office to file a complaint, and prepared a written report about their meeting. (Id. ¶ 86; ECF No. 28-2 (Wisneski Depo.) at 48-52.) Kuhns, who had the authority to investigate and file charges of police brutality and misconduct, determined that charges should not be filed against the police as a result of the July 4, 2010 incident. (ECF No. 40 ¶ 89.)

## B. **The Criminal Proceedings**

As a result of the July 4, 2010 incident, Wisneski was charged with numerous crimes in the Criminal Division of the Court of Common Pleas of Westmoreland County, Pennsylvania, including a) DUI, b) escape, c) fleeing or attempting to elude an officer, d) recklessly endangering another person, e) resisting arrest, f) failure to stop at a red signal, g) disregarding traffic lane (single), and h) reckless driving. (ECF No. 40 ¶ 13; Docket No. CP-65-CR-0003102-2010, Charges.[2]) The last three charges were withdrawn, and a jury trial was held on the first five charges on September 28 and 29, 2011. (ECF No. 40 ¶ 14; Docket No. CP-65-CR-0003102-2010, Disposition Sentencing/Penalties.) On September 29, 2011, the jury returned guilty verdicts on all five charges. (ECF No. 40 ¶ 16; Docket No. CP-65-CR-0003102-2010,

_____

[2] Courts are permitted to take judicial notice of matters of public record, prior judicial opinions, and official court records, including trial transcripts. McTernan v. City of York, Pa., 577 F.3d 521, 526 (3d Cir. 2009).

Disposition Sentencing/Penalties; ECF No. 41 (State Criminal Trial Transcript) at 291, 298-99.)
The Pennsylvania Superior Court affirmed Wisneski's convictions, without opinion, and the
Pennsylvania Supreme Court denied his petition for allowance of appeal. (ECF No. 40 ¶¶ 17-18.)

1. **The Trial**

Wisneski was represented by counsel during a two-day jury trial held before a
state court trial judge in the Criminal Division of the Court of Common Pleas of Westmoreland
County, Pennsylvania. The Commonwealth presented testimony from Kuhns, Marcoz,
DePelligrin, Dieter, and Denning, three medical professionals who interacted with Wisneski
during his July 5, 2010 visit to the emergency room, and the owner of the property on Locust
Valley Road where Wisneski's car hit the embankment. (ECF No. 41 at 4-5.) The owner had
observed Wisneski being arrested. (Id. at 133-38 .) Wisneski called three witnesses:
Cunningham, Mascherma, and David Trump, a friend who saw Wisneski after he returned home
from the police station on the night of his arrest. (Id. at 5.) None of Wisneski's witnesses were
present at the scene of the initial traffic stop or Wisneski's arrest. Wisneski did not testify at his
criminal trial.

The jury was asked to return verdicts on five criminal charges: (1) DUI; (2)
escape; (3) fleeing or attempting to elude an officer; (4) recklessly endangering another person;
and (5) resisting arrest. (Id. at 279-93.) If the jury found Wisneski guilty of escape, then they
were asked to determine additionally whether Wisneski employed force, threat, deadly weapon,
or dangerous instrumentality or action to affect the escape. (Id. at 282-83.) If the jury found
Wisneski guilty of fleeing or attempting to elude a police officer, then they were asked to
determine additionally whether Wisneski did so while driving under the influence of alcohol,
thereby making the crime a felony. (Id. at 12-13, 283-84.) After deliberating for less than two

hours, the jury found Wisneski guilty on all five charges and answered each of the additional questions in the affirmative.

It is clear from Wisneski's counsel's opening statement, that the circumstances surrounding Wisneski being punched and drive stunned twice during the initial traffic stop, and Wisneski's resulting motivation for driving away from the scene, were critical questions of fact in the criminal trial.

> I know in her opening [the Commonwealth's attorney] told you that the officer had to strike Mr. Wisneski. Well, in his affidavit, he himself says I punched him in the head. And I believe that punch in the head, if I'm correct, I may be wrong, from what I read in the affidavit is to, using the driver's seat, is to his left side of the head. So, he's punched in the head. And you'll have to listen to Officer Denning's testimony both on direct and cross-examination as to why he punched him in the head. The vehicle was stopped. So that's a question.
>
> Then shortly thereafter, although Mr.Wisneski has not taken off, has not brandished a weapon, doesn't yield a knife, didn't do anything, the next thing you know Mr. Wisneski, who is by the way not a large man, he's getting Tasered by Officer DePelligrin. He was Tasered twice. There is a Taser report that she filed. It appears from that that she Tasered him at the neck and I think the upper arm but, again, you'll hear from her and we'll find out together where exactly that Taser occurred.
>
> …
>
> With regard to him being Tasered, again, questionable. Why is this man being Tasered? Put yourself in his position, what is he thinking? He's gotten punched on the side of the head, he's been Tasered with electric current that's now affecting his nervous system, and now he's supposed to just sit there and get out of the car and operate as to what is going to happen to him next?
>
> No, he doesn't do that. But he leaves.
>
> …

Again, this is a man who has been punched, then he's Tasered, and
he's going to get out and do [field sobriety tests] in the context of
this stop where he says I swerved because I avoided a pot hole?

…

He left that scene. He left it because he was afraid. Not because he
was willfully fleeing. Not because he was escaping. And this is
what you're going to have to decide ultimately when you go in to
deliberate.

(Id. at 43-45, 46, 49.)

Wisneski's counsel's closing argument reiterates that the jury was being asked to

find that Wisneski left the scene of the initial traffic stop because he had been attacked by the

police without justification, and was afraid of further police brutality from Denning and

DePelligrin.

And, again, we have to sit and think about what does Mr. Wisneski
think at this point. He's been punched and he's been stun drived
twice. Bolts of electricity have gone through this body. He has
originally -- I want you to consider the fact that he willfully
stopped at that original stop. He didn't take off. But after the Taser
and after the punching, he decides to turn his car on and go.

…

I submit to you, if you believe in your hearts that he took off that
day because he was afraid, because he had been punched and
because he was Tasered twice, then he can't be -- you can't
find [him guilty of escape].

…

So, why would he leave? Because he's trying to elude and flee the
police officers willfully when he stopped originally? The only
conclusion you can come to common sense-wise is the man was
afraid.

…

But, again, use your common sense with regard to this. I'm asking
to you find him not guilty on all charges simply and solely because

> this wasn't a man who was trying to commit an offense or do anything to run away from the police in any way or be belligerent with them. He was a man that was afraid, and rightfully so.

(<u>Id.</u> at 254-55, 259.)

The Commonwealth's closing argument similarly emphasizes what the jury was being asked to decide.

> But there is no evidence in this case that the defendant ran just because he was afraid, or that Officer Denning punched him for no reason, or that Officer DePelligrin came running up with her Taser and Tased him just because she was out to get him. There's none of that evidence in this case.
>
> …
>
> The defense would have you believe that Officer Denning lied in court about why he punched him, about what was going on.
>
> …
>
> [T]here's no evidence he's leaving because he's afraid and there's no evidence he's just been beat up for no reason.

(<u>Id.</u> at 260, 261, 267.)

The trial judge's final instructions confirm that the jury was being asked to decide what happened during the initial traffic stop.

> Now, there was evidence in this case that tended to show that the defendant fled from the police. Defense counsel has maintained that the defendant left because he was afraid. Credibility, weight, effect of the evidence is for you to decide. Generally speaking, when a crime has been committed and the person thinks he or she may be accused of committing it and he or she flees, conceals himself or herself, such flight or concealment is a circumstance tending to prove that the person is conscious of guilt. Such flight does not necessarily show consciousness of guilt in every case. A person may flee for some other motive and may do so even though innocent.
>
> Whether the evidence of flight in this case should be looked upon as tending to prove guilt depends on the facts and circumstances of

the case and especially upon the motives that may have prompted the flight. You may not find defendant guilty solely based on evidence of flight.

…

Thus, you cannot find the defendant guilty [of resisting arrest] if you find that he merely tried to run away from or scuffle with the police officer.

(Id. at 279, 285.)

After the jury returned its verdict, the trial judge thanked the jurors for their service and noted that "[t]his was a classic jury case where the facts had to be determined and you did that." (Id. at 300.)

Although the Commonwealth presented evidence concerning the circumstances of Wisneski being pulled from his car after he hit the embankment on Locust Valley Road, Wisneski presented no evidence with respect to this second police interaction, and his counsel's argument on the issue was limited to one statement that "[i]t's a routine stop and we have a man who's seat belted and sitting there and it takes all this effort to get him out of his car." (Id. at 258.)

To reiterate, the jury found Wisneski guilty of all five crimes with which he was charged. (Docket No. CP-65-CR-0003102-2010, Disposition Sentencing/Penalties.) Wisneski was sentenced to serve between 21 and 42 months imprisonment on the most serious of those charges, i.e., escape, concurrently with the lesser sentences imposed for the remaining four criminal convictions. (Id.)

## 2. **The Appeal**

Wisneski appealed his convictions and sentences. In his brief on appeal, Wisneski challenged the sufficiency of the evidence with respect to each offense, except the DUI charge. Wisneski also sought a new trial based upon the Commonwealth's comments, during closing argument, purportedly vouching for the credibility of the police officers who testified against him.

With respect to the escape charge, Wisneski argued that the evidence at trial was insufficient to establish that he "unlawfully removed himself from official detention," in violation of 18 Pa. Cons. Stat. § 5121(a), because the "evidence which was presented at trial established that [Wisneski] removed himself from the location of where his vehicle was initially stopped in response to the physical confrontation which he encountered with the police officers, which resulted in [Wisneski] being injured from the two (2) Taser shots which Officer DePelligrin applied to his body." Brief for Appellant, Commonwealth v. Wisneski, 60 A.3d 587 (Pa. Super. Ct. 2012) (No. 109-WDA-2012), 2011 WL 9289700 at *20.

With respect to the fleeing or eluding charge, Wisneski argued that the evidence at trial "failed to establish that he 'willfully' failed or refused to bring his vehicle to a stop, or that he fled or attempted to elude a pursuing police officer," in violation of 75 Pa. Cons. Stat. § 3733(a), because "the evidence established that [Wisneski] was intoxicated, and that immediately prior to the vehicle pursuit [Wisneski] had been involved in a physical encounter with the police officers and was in a situation where he not been arrested, but was shot two (2) times with the Taser gun which Officer DePelligrin used on him during the incident." Id. at *21.

With respect to the reckless endangerment charge, Wisneski argued that the "evidence presented at trial failed to establish that he recklessly engaged in conduct which placed or may have placed another person in danger of death or serious bodily injury," in violation of 18 PA. CONS. STAT. § 2705, and that "the police officers who were involved in the incident were not injured, and the evidence at trial failed to establish that [Wisneski] made any attempts to cause injuries to the officers throughout the course of the incident." Id. at *22.

With respect to the resisting arrest charge, Wisneski argued "that evidence which was presented at trial failed to establish that he created a substantial risk of bodily injury to any of the police officers who were present at the scene, or employed means justifying or requiring substantial force to overcome the resistance," as required under 18 PA. CONS. STAT. § 5104. Id. at *23.

In opposition to Wisneski's appeal, the Commonwealth argued that there was sufficient evidence to support the jury's verdicts and that "[i]n short, the jury accepted the version of events that was put forth by the Commonwealth's witnesses." Brief for Appellee, Commonwealth v. Wisneski, 60 A.3d 587 (Pa. Super. Ct. 2012) (No. 109-WDA-2012), 2012 WL 4943925 at *10. With respect to Wisneski's request for a new trial due to the Commonwealth's comments during closing argument that purportedly vouched for the testifying officers' credibility, the Commonwealth stated:

> [a]s the trial court explained in its Rule 1925(b) opinion, the prosecutor's comments, taken in context, were nothing more than fair response to statements and allegations made by Wisneski in his opening statement and closing argument, to the effect that the officers' depiction of events was entirely fabricated, and that instead of trying to prevent a public safety hazard by preventing him from driving away, they essentially attacked and injured him without cause and instilled such fear in him that he had no choice but to drive away.

Id. Throughout its brief, the Commonwealth noted that Wisneski asserted at trial that he was "the victim of police brutality," and fled the scene of the first traffic stop because he was "afraid," but that the jury found the officers' testimony credible and concluded that "the physical encounter with the police was entirely of Wisneski's own making." Id. at *13, 19-20, 21.

The Superior Court of Pennsylvania affirmed each of Wisneski's convictions without opinion. Commonwealth v. Wisneski, 60 A.3d 587 (Pa. Super. Ct. 2012). The Pennsylvania Supreme Court denied Wisneski's petition for allowance of appeal. Commonwealth v. Wisneski, 63 A.3d 1247 (Pa. 2013).

**C. The Instant Case**

In this lawsuit, Wisneski alleges that his constitutional rights were violated because he was subjected to excessive force on July 4, 2010. (ECF No. 40 ¶ 90.) Wisneski specifically averred in his complaint that: (1) Denning punched him without provocation; (2) DePelligrin used her stun gun on him even though he was non-violent and posed no threat; (3) he was provoked to drive away from the initial traffic stop in order to avoid excessive force caused by the "brutal assault" by Denning and DePelligrin; (4) he merely lead officers on a "low-speed" chase and did not "operate his vehicle in order to harm any bystanders or any officers;" and (5) the officers "forcibly removed" or "brutally extricated" him from his car after he drove into the embankment "rather than ordering Wisneski to exit the vehicle in a calm fashion." (Id. ¶ 91.) As will be discussed later in this opinion in context, Wisneski attempted to supplement his allegations during the course of this litigation to include claims, for example, that he was subject to a third drive stun at his Locust Valley Road arrest and was denied medical treatment at the police station.

17

Wisneski contends in this case that the criminal charges of which he was convicted in Westmoreland County would not have been filed "had the police not assaulted [him] and used unwarranted and excessive force against him." (Id. ¶ 92.) Wisneski seeks to recover monetary damages from all defendants, including punitive damages from officers Denning, DePelligrin, Dieter, and Marcoz in their individual capacities.

## II.    SUNMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows that there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact – that is, a fact that would affect the outcome of the suit under the governing substantive law – will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Even then, the dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. Id. at 248-49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255; Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The summary judgment inquiry asks whether there is a need for trial – "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (citing cases); Liberty Lobby, 477 U.S. at 248-49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. Celotex, 477 U.S. at 323; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (citing Celotex, 477 U.S. at 325). A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. Celotex, 477 U.S. at 322-23. Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. FED. R. CIV. P. 56(e); see Liberty Lobby, 477 U.S. at 247-48; Celotex, 477 U.S. at 323-25. If the

evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law.  Liberty Lobby, 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  Corliss v. Varner, 247 F.App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

## III.  DISCUSSION

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States. Morrow v. Balaski, 719 F.3d 160, 165-66 (3d Cir. 2013) (citing Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc)).  In this case, Wisneski alleges that his constitutional rights were violated because he was the victim of excessive force and was denied necessary medical care while in custody.  The court will consider each claim separately below, but, to summarize, finds that Wisneski cannot avoid the entry of judgment as a matter of law with respect to either of his § 1983 claims.

## A. **Excessive Force Claims**

### 1. **Legal Principles**

#### a. **Excessive Force**

When excessive force is used during an investigatory stop or arrest by law enforcement officials, the Fourth Amendment right to be secure against unreasonable seizures is implicated. U.S. Const. amend. IV; Graham v. Connor, 490 U.S. 386, 393-94 (1989). The Fourth Amendment requires police officers to use only the degree of force that is reasonably necessary. Tenn. v. Garner, 471 U.S. 1, 9-10 (1985).

The Fourth Amendment reasonableness inquiry is an objective one, determined in light of the totality of the facts and circumstances confronting the officers, without regard to their underlying intent or motivation. Sharrar v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham, 490 U.S. at 396-97), abrogated on other grounds, Curley v. Klem, 499 F.3d 199, 209-10 (3d Cir. 2007 ). In deciding whether an officer's acts constitute excessive force, a jury is asked ultimately to decide whether the officer's actions were "objectively reasonable." Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004) (citing Graham, 490 U.S. at 396). This determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," as well as other relevant factors such as "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Graham, 490 U.S. at 396; Sharrar, 128 F.3d at 821-22.

In evaluating the objective reasonableness of police action, the Supreme Court has cautioned that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." <u>Graham</u>, 490 U.S. at 396 (internal citation and quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." <u>Id.</u>

### b.  **The *Heck* Rule**

Twenty years ago, the United States Supreme Court held that a plaintiff may not recover damages under § 1983 if doing so would imply the invalidity of a prior criminal conviction. <u>Heck v. Humphrey</u>, 512 U.S. 477, 487 (1994). In reaching this holding, the Supreme Court explained that:

> Thus, when [an individual] seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed.

<u>Id.</u> at 487.

The <u>Heck</u> doctrine does not create a <u>per se</u> bar to a claim for excessive force even if the § 1983 plaintiff was previously convicted of resisting arrest, assault, or a similar crime arising out of the same incident. <u>Garrison v. Porch</u>, 376 F.App'x 274, 277-78 (3d Cir. 2010) (conviction for simple assault did not bar excessive force claim); <u>Lora-Pena v. FBI</u>, 529 F.3d 503, 506 (3d Cir. 2008) (convictions for assault on a federal officer and resisting arrest did not

bar excessive force claim); <u>Green v. New Jersey State Police</u>, 246 F.App'x 158, 162 & n.8 (3d

Cir. 2007) (conviction for aggravated assault did not bar excessive force claim); <u>Nelson v.

Jashurek</u>, 109 F.3d 142, 145-46 (3d Cir. 1997) (conviction for resisting arrest did not bar

excessive force claim.  As the court of appeals explained, a reasonable jury could find,

considering the totality of the circumstances, that an individual resisted a lawful arrest or

assaulted the arresting officer, but was still subjected to an unreasonably excessive level of force

in response. <u>Garrison</u>, 376 F.App'x at 277-78 (citing <u>Nelson</u>, 109 F.3d at 146); <u>Lora-Pena</u>, 529

F.3d at 506.   Simply put, an officer can "effectuate[] a lawful arrest in an unlawful manner."

<u>Nelson</u>, 109 F.3d at 146.

       Although there is no <u>per se</u> bar, where a criminal jury necessarily or inherently

rejected a defendant's version of the facts or legal defense in returning a guilty verdict, a

judgment in favor of that defendant in a subsequent § 1983 case would necessarily contradict the

criminal jury's findings and is barred by <u>Heck</u>.  <u>Jennings v. Fetterman</u>, 197 F.App'x 162, 164 (3d

Cir. 2006) (affirming district court's application of <u>Heck</u> rule where conviction for attempted

homicide necessarily meant that the jury rejected plaintiff's theory that he shot the officer in self-

defense); <u>Nicholson v. Kober</u>, No. 05-1212, 2007 WL 2011549, at *2 (W.D. Pa. Jul. 6, 2007)

(granting motion to dismiss because success on excessive force claim would necessarily imply

the invalidity of plaintiff's aggravated assault convictions, which were based upon the criminal

jury necessarily rejecting plaintiff's claim that the officer shot him in the back without

provocation).

       Application of the <u>Heck</u> rule is, of necessity, a fact-intensive inquiry by which a

court must determine what essential facts were determined by the jury in the criminal trial, and

what affect those decisions have on a later § 1983 claim. <u>Cf</u>. <u>Sharif v. Piccone</u>, 740 F.3d 263,

269-70 (3d Cir. 2014) (examining the extent to which a <u>nolo</u> <u>contendere</u> plea admits facts in order to assess effect of the <u>Heck</u> rule on plaintiff's § 1983 claims).

### 2.  **Summary of Arguments**

Defendants seek entry of judgment in their favor on Wisneski's excessive force claims on the ground that the rule announced in <u>Heck</u> bars any recovery by Wisneski.  According to defendants, Wisneski's excessive force claims are premised on factual assertions that conflict with his underlying criminal convictions. (ECF No. 29 at 3-10.)  Defendants demonstrate that the arguments made by Wisneski during his criminal trial to the effect that he was under attack by Denning and DePelligrin and fled because he feared further police brutality, are the same arguments being made by Wisneski in support of his excessive force claims in the instant § 1983 case. (<u>Id.</u> at 7-10.)  Defendants contend that Wisneski's instant lawsuit seeks to "re-litigate the underlying facts or the elements of his crimes" and to "recover on justification theories" that were rejected by the Westmoreland County jury. (<u>Id.</u> at 9.)  Simply put, Wisneski, in this lawsuit, contends that all use of force was unwarranted because he posed no threat to the officers, or the public, whereas the Westmoreland County jury was presented with, and rejected, that precise theory, making the <u>Heck</u> bar applicable.

Defendants' alternative arguments are a) that Denning's punch, DePelligrin's use of her stun gun, and the officers' forcible removal of Wisneski from his car and handcuffing of him were each objectively reasonable uses of force under the circumstances, b) that the officers are entitled to qualified immunity, and c) that Wisneski failed to adduce sufficient evidence to support a claim for municipal or supervisory liability under § 1983. (<u>Id.</u> at 11-20.)

In opposition, Wisneski attempts to distinguish this civil lawsuit from his criminal trial and conviction by asserting that there are five key facts, which were not decided by the

Westmoreland County jury and which remain in dispute in this Fourth Amendment excessive use of force case, which preclude entry of judgment as a matter of law in defendants' favor. (ECF No. 34 at 2-3.)  Those facts are: (1) the precise circumstances under which Denning punched Wisneski during the initial traffic stop, including whether or not Wisneski's car was running and Wisneski grabbed Denning's left arm; (2) the precise circumstances under which DePelligrin deployed her stun gun during the initial traffic stop, including whether or not his car was running and Wisneski was combative at the time; (3) whether Wisneski ran a red light or bumped DePelligrin's police car during the car chase; (4) the precise circumstances under which a stun gun was used on Wisneski after he drove into the embankment, including whether or not he immediately put his car in park and placed his forehead down on the steering wheel in an "act of submission;" (5) the precise circumstances under which he was forcibly removed from his car; and (6) whether Wisneski requested medical treatment while being processed at the police station following his arrest. (Id. at 2-3, 9-11.)   According to Wisneski, these facts were not resolved against him in his criminal trial because he did not testify. (Id. at 3.)

With respect to defendants' alternative arguments, Wisneski argues that "[g]iven the lack of severity of the crime at issue, the lack of an immediate threat to the officers after Denning even by his own admission no longer had his arm in the car (which Wisneski denies), and the fact the Wisneski did not try to escape until after he was TASERED twice at the first traffic stop, this Court should not find as a matter of law Defendants' actions and use of force were objectively reasonable." (Id. at 10-11.)  Wisneski contends that the officers are not entitled to qualified immunity and that there are disputed facts concerning "an abject lack of proper training" with respect to the proper use of a Taser. (Id. at 3, 11-13.)

In their reply brief, defendants explain why Wisneski's belated assertion that DePelligrin used a stun gun on him at the scene of his arrest on Locust Valley Road cannot create a genuine issue of material fact based upon this record. (ECF No. 39 at 3-4.) In addition to offering counter argument on the municipal liability and qualified immunity issues, defendants argue that Wisneski's denial of medical care claim was not pled, and, in any event, is not supported by sufficient evidence to overcome summary judgment. (Id. at 7-9.)

**3. Discussion**

**a. Force Employed at the Initial Traffic Stop**

Wisneski claims, in the instant case, that he was subjected to excessive force during the initial traffic stop when Denning punched him in the face, and DePelligrin used her stun gun on him twice. According to Wisneski, this unprovoked, gratuitous, and unwarranted police brutality is what caused him to flee the scene of a routine traffic stop. These excessive force claims are barred by the Heck rule because success on them would necessarily imply the invalidity of Wisneski's criminal convictions for escape and fleeing or eluding.

As set forth above in the factual background section, in reaching guilty verdicts on all five criminal charges, the Westmoreland County criminal jury necessarily rejected Wisneski's theory that he fled the scene of the initial traffic stop only because he was the innocent victim of police brutality. Arguments made by both the Commonwealth's and Wisneski's counsel, as well as instructions given and post-verdict comments made by the state court trial judge and the briefing on appeal all demonstrate that the criminal jury's essential role was to determine whether Wisneski's version of the facts was to be believed. See supra Sec. I.B. The jury unequivocally found that it was not. The Westmoreland County jury's verdicts rest on

the fundamental conclusion that Wisneski did not drive away from the initial traffic stop because he was being attacked by Denning and DePelligrin and feared further police abuse.

Any civil liability in this case based upon force used at that initial traffic stop would necessarily require a civil jury to reach the opposite conclusion and find that Wisneski was gratuitously attacked during the initial traffic stop. This result is what the <u>Heck</u> rule forbids. As a panel of the Court of Appeals for the Third Circuit explained, where a finding of liability in an excessive force case would contradict a criminal jury's rejection of the theory that an individual acted in self-defense against police abuse, the <u>Heck</u> rule applies. <u>Jennings</u>, 197 F.App'x at 164; <u>see</u>, <u>Nicholson</u>, 2007 WL 2011549, at *2 (noting that success on excessive force barred by <u>Heck</u> because it would contradict criminal jury's rejection of claim that police officer shot individual in back without provocation).

Wisneski's allegation that the criminal jury did not resolve certain factual disputes concerning details of the initial traffic stop, such as, e.g., when Wisneski started his car and whether Wisneski remembers pulling Denning's wrist or forearm into the car, does not change the analysis or conclusion. These facts are insignificant, immaterial, and without ultimate consequence to the <u>Heck</u> analysis. Resolution of any or all of these facts in Wisneski's favor would not make the <u>Heck</u> rule somehow inapplicable because they do not invalidate the foundational finding made by the criminal jury (i.e., Wisneski did not leave the scene of the initial traffic stop because he was the victim of police brutality).

Because a civil verdict in Wisneski's favor in this case based upon any excessive force alleged to have occurred during the initial traffic stop would be inherently inconsistent with the Westmoreland County criminal jury's verdicts, the <u>Heck</u> rule bars recovery.

### b. **Force Employed at the Locust Valley Road Arrest**

The only other force about which Wisneski complains in the instant case occurred after he drove into the embankment on Locust Valley Road and consists of: (1) DePelligrin allegedly using her stun gun on him; and (2) the officers "forcibly extricate[ing]" him from his car, instead of asking him to get out of the car on his own volition, and taking him to the ground in order to handcuff him. (ECF No. 34 at 9-10.)  Wisneski contends that there are numerous factual disputes about this incident that were not resolved by the Westmoreland County jury, e.g., whether he ran a red light or hit the rear bumper of DePelligrin's police car during the car chase, turned off the engine himself after hitting the embankment, and placed his head down on the steering wheel in an act of submission prior to being pulled from the car. See supra pp. 24-25.

### 1. **Application of the *Heck* Rule**

The Heck rule does not bar Wisneski's claims of excessive force arising out of his Locust Valley Road arrest.  Although it is clear that the escape and fleeing or eluding convictions related to the initial traffic stop and that the reckless endangerment conviction related to the subsequent car chase, it is impossible to discern conclusively from the Westmoreland County jury's verdict what facts supported Wisneski's conviction for resisting arrest.  In its opening statement, the Commonwealth stated that the resisting arrest charge related to Wisneski's actions at the location of his arrest on Locust Valley Road. (ECF No. 41 at 40.)  The state court trial judge's instructions, however, were not as clear, and informed the jury that it could not convict Wisneski of resisting arrest if "he merely tried to run away from or scuffle with the police officer." (Id. at 285.)  Running away from the officer undeniably refers to the initial traffic stop, as it is undisputed that Wisneski refused voluntarily to exit his vehicle after it hit the

embankment on Locust Valley Road. Scuffling with the officer could be in reference to either the initial traffic stop (where Wisneski pulled Denning into his car and slapped at DePelligrin after she drive stunned him) or the Locust Valley Road arrest (where Wisneski refused to exit his car and slapped and smacked the officers as they pulled him out). The record of the criminal trial, therefore, allows for the possibility that Wisneski was convicted of resisting arrest because he refused to take field sobriety tests and fled the scene of the initial traffic stop, and that nothing he did at Locust Valley Road constituted resisting arrest. (ECF No. 41 at 285); 18 PA. CONS. STAT. § 5104. If this was the case, then the Westmoreland County jury's conviction of Wisneski for resisting arrest could have no possible effect under the <u>Heck</u> rule on those excessive force claims that arise out of the force used at Locust Valley Road.

Even if the Westmoreland County jury found that Wisneski resisted arrest at Locust Valley Road, under the facts of this case, that conviction still would not foreclose the possibility that Wisneski was subjected to excessive force during the arrest, and, for that reason, the <u>Heck</u> rule would not bar civil relief. In this regard, for the purposes of the <u>Heck</u> analysis, the initial traffic stop is critically different than the Locust Valley Road arrest. Unlike Wisneski's theory that he fled the initial traffic stop because he was unnecessarily attacked, which theory the criminal jury had to reject in order to convict him of escape and fleeing or eluding, the criminal jury need not have rejected any similar theory advanced by Wisneski in order to find that he resisted arrest at Locust Valley Road. The criminal jury could have believed Wisneski that he placed his head down on the steering wheel in an act of submission, and turned the engine of his car off on his own volition after crashing, and still concluded that he resisted arrest because there is no dispute that Wisneski did not voluntarily get out of his car, and smacked and slapped the officers as they were pulling him out of the car. (ECF No. 40 ¶¶ 60, 63.) Even if Wisneski was

convicted of resisting arrest for doing so, it remains possible that the officers responded to Wisneski's physical resistance with excessive force, and executed a lawful arrest in an unlawful manner. Garrison, 376 F.App'x at 277-78; Lora-Pena, 529 F.3d at 506; Nelson, 109 F.3d at 146. Under the facts of this case, this possibility is in no way foreclosed by the criminal jury's conviction of Wisneski for resisting arrest. For that reason, a finding of excessive force based upon events that took place at Locust Valley Road would not necessarily imply the invalidity of Wisneski's resisting arrest conviction, and the Heck rule does not apply.

### 2. Sufficiency of the Evidence

Because the Heck rule does not bar civil liability in this instance, the court must evaluate the substance of Wisneski's excessive force claims stemming from his Locust Valley Road arrest to determine whether a reasonable jury could conclude that the officers' actions were objectively unreasonable under the circumstances. As set forth above, this determination requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether he is actively resisting arrest or attempting to evade arrest by flight, the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. Graham, 490 U.S. at 396; Sharrar, 128 F.3d at 821-22. Because reasonableness depends on a careful analysis of the facts and circumstances of the use of force, objective reasonableness often remains a question for the jury; however, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under

the circumstances." Kopec, 361 F.3d at 777. In this case, because no reasonable jury could find that any of the officers' actions were objectively unreasonable under the circumstances, the question can be decided as a matter of law.

To reiterate, Wisneski's current allegations are that he was subjected to excessive force in connection with his arrest at Locust Valley Road because a) DePelligrin used her stun gun on him once, and b) he was forcibly removed from his car and thrown to the ground before being handcuffed. (ECF No. 34 at 9-10.) No reasonable jury could conclude that either action, based upon the evidence of record, was objectively unreasonable.

### (a) DePelligrin's Alleged Use of Stun Gun

Wisneski contends that he was subjected to excessive force because DePelligrin used her stun gun on him once after he drove into the embankment on Locust Valley Road, while he remained seated behind the wheel of his car. Defendants deny that DePelligrin used her stun gun at this second location, noting specifically that Wisneski did not allege this use of force in his complaint or in written discovery, contended at his criminal trial that DePelligrin only used her stun gun two times - both during the initial traffic stop - and relied on DePelligrin's "Taser Use Report" in his complaint, which reflects only two uses of the stun gun against Wisneski on the night of July 4, 2010. (ECF No. 1 (Complaint) ¶ 33; ECF No. 28-9 (Taser Use Report); ECF No. 39 at 3-4; ECF No. 40 ¶ 60).) Defendants additionally note the "lack of meaningful description by Wisneski" of this alleged third Taser use. (ECF No. 39 at 4-5.) In connection with their response to Wisneski's belatedly-asserted factual claim in this regard, defendants submit a declaration from Lieutenant Robert Stafford ("Stafford"), the officer responsible for downloading data from each officer's Taser weapon on a quarterly basis, who attests that the report for DePelligrin's weapon reflects only three uses on July 4, 2010: a test fire at 2:37 p.m.,

before her shift started, and two firings at 7:16 p.m. (ECF No. 38-2.)  Wisneski did not challenge Stafford's declaration, or the data on which it relies.

No reasonable jury could conclude that Wisneski's vague and internally inconsistent factual allegation, asserted for the first time three years after his arrest during a deposition in this civil case, creates a genuine dispute of material fact.  A nonmoving party must raise "more than a mere scintilla of evidence in its favor" and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in order to overcome a summary judgment motion. Celotex, 477 U.S. at 325; Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)); Tapp v. Proto, 404 F.App'x 563, 568 (3d Cir. 2010) (finding that ambiguous allegations and vague inferences cannot defeat summary judgment).  A nonmovant's evidence in opposition to a motion for summary judgment must go beyond being merely colorable, and must instead be significantly probative.  Monroe v. Beard, 536 F.3d 198, 206-07 (3d Cir. 2008).   Unless the nonmoving party can create a "sufficient disagreement to require submission [of the evidence] to a jury," summary judgment is to be entered. Liberty Lobby, 477 U.S. at 251-52.

The entirety of Wisneski's evidence in support of his assertion that DePelligrin subjected him to excessive force by using her stun gun on him a third time, after he drove into the embankment on Locust Valley Road, are two exchanges that took place during his deposition in this case.  During the first exchange, Wisneski maintained that DePelligrin used her stun gun on him from the passenger side of his car because he recalled feeling "a jolt" to the right side of his neck at that time and saw a red mark there the next morning. (ECF No. 33-1 at 12 (Depo. Trans. 46-47).)  During this exchange, Wisneski admitted, however, that he did not recall anything after he hit the embankment and put his head down on the steering wheel, and could not

testify about whether or which officers approached his car after he drove into the embankment. (ECF No. 33-1 at 12-14 (Depo. Trans. at 46-53).) There is no evidence in the record with respect to whether DePelligrin was seated inside Wisneski's car or was reaching in through the front, passenger-side window of his car at the time that she allegedly stunned him. During the second exchange, defendants' counsel clarified the point by asking "And as I understand the alleged use of the Taser in the second part of the incident, you base that on feeling a jolt but not actually seeing an officer physically use the Taser; is that correct?" to which Wisneski responded "Correct." (ECF No. 33-1 at 26-27 (Depo. Trans. at 104-05).)

Weighed against this belated, self-serving, vague, and internally inconsistent assertion, is the absence of any reference to a third deployment of DePelligrin's Taser during Wisneski's criminal trial and in Wisneski's pleadings in this case, as well as the Taser Use Report and Stafford declaration, both of which consistently indicate that DePelligrin's weapon was used against Wisneski twice on the night of July 4, 2010. Wisneski does not, and cannot, challenge the validity of these pieces of evidence; the trial transcript and pleadings in this case are matters of public record, Wisneski himself relied on the Taser Use Report in his complaint, and Wisneski produced no evidence challenging the validity of Stafford's assertions. In this evidentiary context, Wisneski's deposition testimony amounts to no more than a scintilla of evidence that is not significantly probative of a third Taser use. No reasonable jury could conclude, based upon this record, that DePelligrin used her stun gun on Wisneski at the Locust Valley Road arrest by holding it against his neck from the passenger side of the car. Wisneski's excessive force claim based upon this alleged third stunning, therefore, fails to survive summary judgment.

Even if the court were to assume, for the sake of deciding the instant motion, that DePelligrin used her stun gun on Wisneski at his Locust Valley Road arrest, judgment in favor of defendants on this claim would still be proper because no reasonable jury could find that such use was objectively unreasonable under the circumstances. In conducting this analysis, the court will resolve each of the alleged factual disputes in favor of Wisneski and find that Wisneski put his car in park immediately after hitting the embankment and placed his forehead on the steering wheel, and that his car was wedged into the embankment such that it could not be driven away. The court concludes, nevertheless, that no reasonable jury could find that DePelligrin's single drive stun to Wisneski's neck constituted excessive force.

The undisputed evidence is that a) officers suspected that Wisneski was driving under the influence of alcohol (which he was), b) Wisneski's conduct during the initial traffic stop required a punch to the face and two drive stuns in order to attempt to gain Wisneski's compliance and ensure officer safety, c) Wisneski refused to exit his vehicle and take field sobriety tests at the initial traffic stop, d) Wisneski started his car and fled the scene of the initial traffic stop, while part of DePelligrin's body was still inside Wisneski's car, e) Wisneski refused to stop, even though he was being pursued by several police cars with their emergency lights and sirens activated, and led police on a more than two-mile car chase, f) Wisneski drove into an embankment in a residential area, rather than voluntarily stop his car, and g) Wisneski did not exit his car when commanded by officers to do so after the collision. These facts indicate that Wisneski was involved in serious crimes at the time, including escape and fleeing, was violent, dangerous, and resistant to being arrested, and posed a threat to the officers and the residents at the Locust Valley Road location. Graham, 490 U.S. at 396; Sharrar, 128 F.3d at 821-22. Given

these facts and the totality of circumstances, no reasonable jury could conclude that a single application of a Taser in drive stun mode was objectively unreasonable.

Although Wisneski makes much of the fact that his car was not running at the time, and could not have been driven away because it was wedged into the embankment, and that he placed his forehead on the steering wheel in an "act of submission," even if true, it does not follow that there was no present danger at Locust Valley Road. Even if Wisneski could not have driven away, he could have fled on foot, physically attacked the officers when they approached his car to take him into custody, or harmed one of the residents who was observing the incident. Factual disputes concerning whether Wisneski ran a red light or hit the rear bumper of DePelligrin's police car are likewise inconsequential. Even if Wisneski did not do those things, there is no dispute that he led several police cars on a multi-mile car chase at speeds exceeding the posted speed limit, which was a danger to the officers and the community. Wisneski's claim that he placed his forehead on the steering wheel in an act of submission, making any further use of force against him illegal, is itself not sufficient evidence. That action is not a universally accepted symbol of surrender, such as stepping toward police with both hands in the air, and any reasonable officer seeing it would not have understood that Wisneski was surrendering. Instead, the action could have been perceived by a reasonable officer as inadvertently caused by the impact with the embankment, or to be a physical expression of frustration and determination to restart the car and get it out of the embankment.

Regardless, even if Wisneski did intend to surrender by placing his head on the steering wheel, and a reasonable officer would have perceived the action as such, it is undisputed that Wisneski still remained behind the wheel of his car, despite being repeatedly ordered to get out. Wisneski was, therefore, still disobeying police orders at the time that DePelligrin allegedly

used her stun gun on Wisneski a third time. Based upon the totality of circumstances and a consideration of the relevant factors, no reasonable jury could find that DePelligrin's isolated use of her stun gun to temporarily incapacitate Wisneski so that he could be removed from the car and handcuffed in order to ensure officer and community safety, was objectively unreasonable.

### (b) Forcible Removal from Car and Handcuffing

Wisneski contends that he was subjected to excessive force because he was "forcibly extricated" from his car and thrown to the ground before being handcuffed. (ECF No. 34 at 9-10.) Defendants seek entry of judgment as a matter of law on this claim on the ground that "the force used was proportionate to the threat and objectively reasonable in view of the circumstances confronted by the officers" including that they were attempting "to effectuate a lawful arrest and to eliminate the safety risks posed by [Wisneski's] criminal conduct." (ECF No. 29 at 4.) Although Wisneski's opposition does not address the force used at his Locust Valley Road arrest specifically, it, in general terms, claims that the facts do not comport with the reasonable use of force as described in the case law. (ECF No. 34 at 9-10.) Wisneski's argument with regard to the reasonableness of the force used during his arrest appears to be that because he no longer posed any threat of driving his car away after it hit the embankment, no force at all should have been used in arresting him. (Id.) This contention is contrary to law and to the facts of this case.

To be clear at the outset, the record reflects that the force used during Wisneski's arrest consisted of a) officers initially attempting to pull Wisneski through the open window of his car, while his seat belt was still buckled, b) officers eventually pulling him out of the car through a partially-opened car door, and c) officers forcing Wisneski to the ground and handcuffing him. (ECF No. 40 ¶¶ 59-63.) Wisneski does not dispute that, during these activities,

he was smacking and slapping at the officers. (Id. ¶¶ 60, 63.) There is no evidence that any officers subjected Wisneski to any physical force that was not for the purpose of removing him from his car and handcuffing him, such as, for example, gratuitous blows, kicks, or strikes. Wisneski agrees that no physical force was used against him after he was handcuffed. (Id. ¶¶ 66-68.) Based upon this record, no reasonable jury could conclude that the officers subjected Wisneski to excessive force.

Wisneski's failure to exit the vehicle when directed to do so and smacking the officers, after fleeing the scene of a traffic stop and taking police officers on a more than two-mile car pursuit "certainly factors into the totality of the circumstances and may have justified a greater use of force than would have been reasonable had [Wisneski] been peaceful and cooperative." Garrison, 376 F.App'x at 278. Wisneski's suggestion that he should have been given the opportunity to exit his car voluntarily and place his hands behind his back in order to be handcuffed is contradicted by the record. Wisneski was not cooperating. He fled the initial traffic stop, with an officer's upper torso in the window, drove his car into an embankment rather than voluntarily stop his car in the roadway, and refused to get out of his car when ordered to do so. It was objectively reasonable, and necessary, under the circumstances, for the officers physically to pull him out of the car and take him into custody as quickly as possible in order to avoid further threat of harm to themselves or the public. No reasonable jury could find, based upon this record, that the officers' actions were objectively unreasonable.

There is no question that the circumstances at the Locust Valley Road scene were such that Wisneski may have suffered more injuries than he would have if he had been pulled out of his car under a different set of facts. For instance, the officers were initially unable to open his car door and tried pulling him out of the window of his car, without realizing that his seat belt

was still engaged. (ECF No. 40 ¶¶ 61, 63.) Even when the officers were able to open the car door, it would not open the entire way, because it was against the embankment. (Id. ¶ 62.) The seat belt and the door's position, without doubt, made Wisneski's removal from the vehicle more difficult, and likely resulted in bruising and scraping. However, these circumstances do not make the force excessive. "[T]he presence or absence of a physical injury is but one relevant factor to consider in the Fourth Amendment excessive force analysis." Velius v. Twp.of Hamilton, 754 F.Supp.2d 689, 694 (D.N.J. 2010) (citing Sharrar, 128 F.3d at 822). The officers were justified in acting with urgency to get Wisneski out of his car and into handcuffs. Wisneski had engaged in serious crimes, proved to be dangerous to the officers, the public, and himself, and was resistant to being arrested as evidenced by the fact that he fled the scene of the initial traffic stop, refused to exit the vehicle voluntarily, and smacked at the officers while they pulled him out of his car. No reasonable jury could find that the officers' actions in using force to pull him out of his car and apply handcuffs were objectively unreasonable under the circumstances.

B. **Denial of Medical Care Claim**

1. **Legal Principles**

An arrestee who is in the custody of governmental officials must be given medical attention for injuries. Although the Eighth Amendment applies only to defendants after they have been sentenced, arrestees and other pretrial detainees are entitled to no less protection than a convicted prisoner is entitled to, and courts in this judicial circuit apply the same legal tests and standards. Pierce v. Cherry Hill Twp., No. 09-6487, 2013 WL 3283952, at *7 n.8 (D.N.J. Jun. 26, 2013) (collecting decisions). Delay or denial of such care can violate the Eighth and Fourteenth Amendments of the United States Constitution if it rises to "deliberate indifference to a serious medical need." Id.; Estelle v. Gamble, 429 U.S. 97, 105 (1976).

To establish a violation of this constitutional right, a plaintiff is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). "A medical condition is 'serious,' if it is '…one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" Nykiel v. Borough of Sharpsburg, 778 F.Supp.2d 573, 584 (W.D. Pa. 2011) (quoting Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)). "[C]ulpability under 'deliberate indifference' requires a subjective awareness of the risk of harm, in addition to a failure to take reasonable steps to avoid that harm." Maclary v. Carroll, No. 04-065, 2008 WL 523615, at *2 (D. Del. Feb. 26, 2008) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

## 2. **Summary of Arguments**

In his opposition brief, Wisneski argues that his § 1983 claims survive summary judgment because various facts are in dispute, including that he "asked for medical attention for his injuries but was refused such treatment." (ECF No. 34 at 9-10.) In response, in their reply brief, defendants contend that Wisneski's denial of medical treatment claim should be rejected because it was not pled, and alternatively, because Wisneski failed to produce sufficient evidence to establish the essential elements of such a claim. (ECF No. 39 at 7-9.)

## 3. **Discussion**

### a. **Failure to Plead**

The sole reference to Wisneski's request for medical care is in paragraph 30 of the complaint, which states that "Wisneski's injuries were extensive, including multiple abrasions and contusions to his body and extremities, with bleeding on his extremities. He received trauma to his head with abrasions and bleeding from his nose. He required medical evaluation and treatment for those injuries, but despite his requests, the Greensburg police would not permit him

to be evaluated for injuries while in custody.  Instead, Plaintiff Wisneski sought evaluation at the

Westmoreland Hospital Emergency Room on the morning after his release from arrest."  (ECF

No. 1 ¶ 30.)[3]  The apparent purpose of this averment is to describe the injuries Wisneski

allegedly sustained, and the treatment he sought.  Wisneski pled only three claims, each of which

was grounded in allegations of excessive force. (Id. ¶¶ 41-55.)   A claim for denial of medical

treatment was not pled, and no motion for leave to amend such a claim was filed.  The specter of

such a legal claim, therefore, cannot now be used to defeat summary judgment.

### b.  Sufficiency of the Evidence

Even assuming that the claim had been pled, or could be pled, Wisneski failed to

produce sufficient evidence to support it.  In order to state a viable claim based upon a denial of

medical care, Wisneski must produce evidence to support a reasonable jury finding that the

officers were deliberately indifferent "to a serious medical need." Estelle, 429 U.S. at 105;

Pierce, 2013 WL 3283952, at *7 n.8.  "A medical condition is serious, if it is …one that is so

obvious that a lay person would easily recognize the necessity for a doctor's attention." Nykiel,

778 F.Supp.2d at 584 (internal quotation marks omitted).   "[C]ulpability under deliberate

indifference requires a subjective awareness of the risk of harm, in addition to a failure to take

reasonable steps to avoid that harm." Maclary, 2008 WL 523615, at *2 (internal quotation marks

omitted).

There is no evidence from which a reasonable jury could conclude that Wisneski

obviously required a doctor's attention.  The record reflects that Marcoz noticed no injuries on

Wisneski during his booking, and that Denning only saw scratches on his legs. (ECF No. 40 ¶¶

---

[3] Notably, this averment is undeniably false as Wisneski did not go to the emergency room until almost 10:00 p.m. on July 5, 2010, which is approximately twenty-four hours after his arrest and release from custody. (ECF No. 40 ¶ 82.)

75, 77.)  Wisneski's own evidence is that he suffered scrapes, bruising, and scratches. (ECF No.

40 ¶ 83.)  Courts throughout the country have found that bruising and abrasions with associated

bleeding do not to rise to the level of a "serious medical need." See e.g., Chatin v. Artuz, 28

F.App'x 9, 10-11 (2nd Cir. 2001) ("Chatin's condition, which medical staff at various stages of

his treatment diagnosed as a sprained ankle, a bone spur, and a neuroma, did not rise to the level

of seriousness that the Eighth Amendment requires."); Davis v. Jones, 936 F.2d 971, 972-73 (7th

Cir. 1991) (a scraped elbow and a one-inch cut to an arrestee's temple, neither deep enough nor

long enough to require stitches, were not sufficiently "serious" to require prompt medical

attention under the Eighth Amendment), reh'g denied, 946 F.2d 538 (7th Cir. 1991); Gaudreault

v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990) (injured detainee who was "bruised

but unbroken, requiring no more medical care than a sling, an eye-patch and the application of

some disinfectant" for abrasions did not have a "serious medical need"), cert. denied, 500 U.S.

956 (1991); Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990) (inmate's swollen, bleeding

wrists from handcuffs that were too tight do not constitute a serious medical need); Vilchis v.

City of Bakersfield, No. 10-893, 2012 WL 113747, at *12 (E.D. Cal. Jan. 13, 2012) (finding

inmate's visible injuries to the head and face, described to be "abrasions and contusions, with

some associated bleeding," did not rise to the level of a serious medical need); Ortiz v. Thomas,

No. 09-396, 2009 WL 811452, at *2-3 (D. Ariz. March 27, 2009) (dismissing prisoner's

deliberate indifference claim that he suffered "bruises, headaches, and joint pain due to an

alleged use of excessive force," because this failed to describe a "serious medical need"); Ford v.

Phillips, No. 05-6646, 2007 WL 946703, at *12 (S.D.N.Y. Mar. 27, 2007) ("[a]brasions, a minor

bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or

extreme pain," and were thus not sufficiently serious); Ruffino v. Gomez, No. 05-1209, 2006

WL 3248570, at *7-8 (D. Conn. Nov. 8, 2006) (bruises, scrapes and scratches treated with antibiotic ointment did not rise to the level of a "serious medical need").

The uncontradicted evidence of record is that it would not have been obvious to the officers that Wisneski required immediate medical attention because he had scrapes and bruises on his lower leg, right temple, left back, and buttocks, the latter of which would be an area not even visible to the officers. (Id. ¶¶ 83, 118, 121.) Wisneski was released from police custody on the same night that he was arrested. (ECF No. 40 ¶ 80.) He was picked up by his girlfriend and a personal friend. (Id.) His friends took him straight home. (Id. ¶ 81.) Wisneski admits that he decided that he did not need immediate medical attention upon being released from police custody. (ECF No. 28-2 at 27.) He did not go to the emergency room until approximately twenty-four hours after his release from custody. (ECF No. 40 ¶ 82.) Even after going to the emergency room, there is no evidence that Wisneski sought follow-up treatment for any injuries. (Id. ¶ 84.) This sequence of events reflects that Wisneski's injuries, whatever they were, were not so serious that a lay person would easily recognize the necessity of a doctor's immediate attention. Relevant to this calculus is that Wisneski was not jailed overnight, and was released to the custody of a girlfriend and friend, who were capable of immediately taking him to the hospital if necessary, but did not.

Even if Wisneski's injuries rose to the level of a serious medical need, the record is devoid of any evidence that the officers were subjectively aware of Wisneski's need to see a doctor, but deliberatively indifferent to it. To the contrary, the record reflects that the officers who interacted with Wisneski on the night of his arrest noticed either no injuries, or minor scrapes on his legs. (Id. ¶¶ 75, 77.) There is no evidence of record to contradict that these were the physical injuries actually observed by the officers. Such injuries do not support an inference

that the officers were subjectively aware of Wisneski's need for immediate medical attention.

Wisnseski's vague assertion that he asked an unidentified officer "about could I seek some

medical attention" while at the Greensburg police station, (ECF No. 28-2 at 25), is insufficient,

standing alone and against the other evidence of record, to support a reasonable jury finding that

the officers had a subjective awareness of the risk of harm to Wisneski.

To the extent Wisneski could, as a matter of procedure, assert a § 1983 claim

based upon the denial of medical treatment, there is insufficient evidence to warrant submission

of that claim to a jury.[4]

### C. Municipal and Supervisory Claims

To prevail under § 1983 against a municipality, a plaintiff must demonstrate that

the municipality itself, through the implementation of a practice, policy, or custom, caused a

constitutional violation. Monell v. Dep't of Social Services of City of New York, 436 U.S. 658

(1978). In order to assess liability against the municipality, a court must ask "(1) whether

---

[4] Because the court concludes that Wisneski failed to establish that he was subjected to excessive force or denied medical care, defendants' arguments with respect to qualified immunity are superfluous. In the event, however, that any police conduct is deemed to be unconstitutional in this case, the officers would be entitled to qualified immunity. Such immunity would attach to both the officers who were at the scene of Wisneski's initial traffic stop and arrest, and the supervisory officers, whom Wisneski alleges were "managers of the police department."(ECF No. 34 at 13); Procunier v. Navarette, 434 U.S. 555, 561-62 (1978). As set forth in the body of this opinion, and under the facts of this case, no reasonable official would understand that the purported single use of a stun gun at Wisneski's Locust Valley Road arrest, the forcible removal from the car and handcuffing of Wisneski, and the failure to obtain immediate medical care for Wisneski's minor scrapes and bruises violated a clearly established constitutional right. Pearson v. Callahan, 555 U.S. 223, 231-32, 42 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Although the immunity would not attach to the City, Monell, 436 U.S. at 690-91; Owen v. City of Independence, Mo., 445 U.S. 622, 650 (1980), it would nevertheless follow that no reasonable jury could find that the City violated Wisneski's constitutional rights by failing to adequately train or supervise its officers with respect to these matters because there is a complete lack of probative evidence in that regard.

plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the City is responsible for that violation." Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120 (1992).

Supervisory liability under § 1983 utilizes similar standards. A supervisor may be liable for the acts of a subordinate if he fosters a practice, policy, or custom that amounts to deliberate indifference to a constitutional violation. Carter v. City of Phila., 181 F.3d 339, 356 (3d Cir. 1999). To establish supervisory liability, a plaintiff "must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that the unreasonable risk existed, (4) the supervisor was deliberately indifferent to the risk, and (5) the underling's violation resulted from the supervisory practice or procedure." Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).

A claim for municipal or supervisory liability is entirely derivative of the underlying constitutional violation. Where a plaintiff cannot prove that his constitutional rights were violated, he cannot bring a viable municipal or supervisory liability claim under § 1983. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Brown v. Dep't of Health Emergency Med. Services Training Inst., 318 F.3d 473, 482 (3d Cir. 2003) (citing Collins, 503 U.S. at 122); Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) ("any claim that supervisors directed others to violate constitutional rights necessarily includes as an element an actual violation at the hands of subordinates"). There can be no municipal or supervisory liability in this case because Wisneski's constitutional claims do not survive summary judgment.

IV.      **<u>CONCLUSION</u>**

   For the foregoing reasons, defendant's motion for summary judgment is granted.

An appropriate order will be filed contemporaneously with this opinion, and this case will be

closed.


Date: April 30, 2014           BY THE COURT:


            <u>/s/ *Joy Flowers Conti*</u>
            Joy Flowers Conti
            Chief United States District Judge